Hilary A. Boyd, OSB No. 152095
hilary@beattyboyd.com
Beatty & Boyd LLP
117 SE Taylor St. #201
Portland, OR 97214-2276
Telephone: (503) 506-8995
Facsimile: (971) 328-3678

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| CHARLEE'S CANDIES, LLC, | Case No.: 6:26-cv-00100-AP |
| Plaintiff, | |
| v. | AMENDED COMPLAINT |
| WOODBURN PREMIUM OUTLETS, LLC, | (Contract Rescission for Fraud in the Inducement) |
| Defendant. | Plaintiff's Prayer: $1,262,515.17 |

Plaintiff alleges:

**PARTIES**

1.

Charlee's Candies., LLC ("Plaintiff") dba Rocket Fizz Woodburn is a limited liability

company formed in Oregon and a franchisee of RPM Summit Group, LLC, dba Rocket Fizz

AMENDED COMPLAINT        1

Soda Pop and Candy Shops.  Plaintiff's principal place of business in Marion County, Oregon, and the member-owners are Oregonians.

2.

Woodburn Premium Outlets, LLC ("Defendant") is a limited liability company formed in Delaware with its principal place of business in Indiana.  Woodburn Premium Outlets, LLC is an entity owned, directly or indirectly, by Simon Property Group, L.P., ("Simon") the Operating Partnership of the publicly traded real estate investment trust Simon Property Group, Inc.

**JURISDICTION AND VENUE**

3.

The subject of this litigation is a dispute over the legality of a commercial lease ("the Lease") for retail space located in the Woodburn Premium Outlets in Marion County, Oregon.

**FACTS**

4.

RPM Summit Group, LLC dba Rocket Fizz Soda Pop and Candy Shops ("Rocket Fizz" or "Franchisor") is a retailer of specialty, unique, and hard to find candies, confections, sodas and other beverages, and novelties.  Plaintiff purchased a Rocket Fizz franchise on or about on February 28, 2023.

5.

Plaintiff searched for retail space and ultimately came to investigate its prospects for space with Defendant, beginning on or about September 8, 2023.

6.

Simon owns malls, outlets and commercial retail properties all over the world, including, directly or indirectly, the Defendant.

7.

Simon holds itself out as being an innovator in retail intelligence and retail technology, or, the tools and applications focused on the creation, management, and analysis of data relating to the variables of retail profitability, including, but not limited to, pedestrian shopper flows and magnitudes.

8.

Based on belief, Defendant and Simon include in all Leases the right to collect financial data from their commercial tenants, and actually does collect financial data from its commercial tenants, in part in service of their retail intelligence purposes, and in part in service of using that data to persuade prospective tenants to sign leases.

9.

Based on belief, Simon's properties, including Defendant, have available to them the benefits of Simon's retail intelligence and retail technologies.

10.

Plaintiff hired and worked with commercial real estate broker Mark Banta of Commercial Realty Advisors Northwest LLC  ("Broker") in searching for a retail space and in negotiating lease terms.  Mr. Banta made and maintained the direct contact with Defendant on Plaintiff's behalf throughout the due diligence/inspection period before Plaintiff ultimately entered into the Lease with Defendant on December 5, 2023.

11.

Plaintiff consulted with its Franchisor throughout the due diligence/inspection period, in compliance with requirements that Plaintiff obtain the Franchisor's preliminary acceptance of the

AMENDED COMPLAINT                    3

proposed franchise location as well as in order to provide information and data about Rocket Fizz requested by Defendant and Simon.

12.

Plaintiff also worked with its retained real estate attorney at all material times.

13.

The first material contact between Plaintiff's Broker and Defendant/Simon occurred on or about September 15, 2023 wherein Defendant confirmed there was a space available, that it would provide no rental rate until seeing a sales estimate from Rocket Fizz, and gave its

Common Area Maintenance ("CAM") of $16.21per square foot, taxes of $4.36 per square foot, and marketing budget of $4.50 per square foot.

14.

The initial assessment of both Broker and Franchisor during email conferrals on September 18, 2023 was that the known components of leasing with Defendant were expensive, especially in light of the location of the available space within the Outlets, and that the high cost might not offset the foot traffic (not known at that time to Plaintiff, Broker or Franchisor).

15.

Plaintiff and Franchisor instructed Broker the same day to get the annual visitor count to the Woodburn Outlets, and the request for that metric was made to Defendant and Simon's agent, leasing representative Marc Wolfer, on September 18, 2023.

16.

Franchisor, as part of urging Broker to obtain the annual visitor count, emphasized the metric's importance, stating: "Rent should be considered with the traffic count. That dictates value."

AMENDED COMPLAINT                    4

17.

Marc Wolfer responded to Broker's request on or about September 20, 2023, advising that the annual customer count for the Woodburn Premium Outlets is 4 to 5 million annually and provided the tenant sales average per square foot.

18.

Directly following Marc Wolfer's representation, Franchisor recommended pursuing Defendant's available space, stating: "Those are strong numbers. Are there vacancies? If so, let's go down this road."

19.

Defendant's available space was a 1,562 square foot one, along the west elevation of Defendant's property, at what anyone on I-5 would deem to be the back of the mall.

20.

Understanding that the location of the space within the mall would influence foot traffic and produced varied sales data results, Plaintiff instructed Broker to request sales data for select stores within the mall, a cross-section of retailers representative of similarities with and differences from Plaintiff, aimed at projecting sales data.

21.

Broker requested the sales data of 8 specific stores within the mall. Of the stores whose sales data requested, two were specialty foods stores like Plaintiff. Of those two stores, one was also at the back of the mall, and therefore similarly situated to the retail space Plaintiff would prospectively occupy.

//

AMENDED COMPLAINT                    5

22.

Defendant's agent Marc Wolfer only reported the rolling sales totals for one of the two specialty foods stores ("Similar Tenant A") – and that one underperformed the per square foot average tenant sales by only $132.

23.

 As for the other specialty foods store at the back of the mall like Plaintiff's prospective retail space ("Similar Tenant B"), Defendant's agent Marc Wolfer advised there was no sales data available for it due to it being a new tenant.

24.

Plaintiff ultimately moved forward with entering into the Lease believing, based on the representations of Defendant, that the lowest grossing of the stores with which it shared the most characteristics was Similar Tenant A.

25.

The grand total of Rent (Minimum Annual Rent plus average CAM, landlord insurance, taxes, and marketing costs), approximately $9,700 monthly, was deemed to be an expensive but justifiable cost in light of the value of what had been represented regarding the mall's foot traffic and reassuring sales data reports for similarly situated tenants.

26.

The Lease was executed on December 5, 2023.

27.

In 2024, Plaintiff did $450.35 below the per square foot tenant sales average represented by Defendant in September of 2023.  2025 sales are slated to be even lower.

//

AMENDED COMPLAINT                    6

28.

In conversations with Similar Tenant B between March of 2025 and now, Plaintiff has learned its neighbor was not at all a new tenant in September of 2023, and that there indeed would have been rolling sales data for said tenant in Defendant's possession at the time of Plaintiff's request that Defendant expressly denied it had.

29.

Further, Plaintiff has since learned, as of the middle of November of 2025, that Similar Tenant B did $448 less in sales per square foot than Defendant's reported tenant average during the period of rolling sales data Plaintiff had requested as part of its due diligence, a fact that Defendant knew and intentionally concealed from Plaintiff, its Broker, and its Franchisor.

30.

Had Plaintiff known of Similar Tenant B's situation, neither it nor its Franchisor would have deemed justifiable the $9,700 per month cost of leasing with Defendant.

31.

Since entering into the Lease, Plaintiff conducted its own measurements of mall foot traffic using tools recommended by its Franchisor. With their tools, they counted 3.2 million visitors in 2024, only 192,000 of whom came within 100 feet of Plaintiff's Rocket Fizz. This information became available to Plaintiff on or about October 13, 2025.

32.

In various phone calls between Plaintiff and Defendant's agent Marc Wolfer in the summer and early fall of 2025, Defendant would not disclose the specific tools it uses to measure foot traffic but advised that it involved cellphone tracking.

//

AMENDED COMPLAINT                    7

33.

Marc Wolfer has denied in phone conversations with Plaintiff that Defendant and Simon have any information beyond the amount of visitors to the mall as a whole and denied that Defendant and Simon collect and maintain any information about foot traffic in specific locations within the mall.

34.

Had Plaintiff known that the foot traffic was nowhere near 4 to 5 million visitors to the mall in general, and that the stores at the back of the mall receive less than 10% of whatever foot traffic the mall as a whole receives, neither Plaintiff nor its Franchisor would have deemed justifiable the $9,700 per month cost of leasing with Defendant.

35.

Plaintiff has not paid its two owners in almost two years.  Member-owner Ben Hoffman personally works multiple shifts in the store per week personally and Plaintiff has cut back to a skeleton crew of employees in order to decrease overhead.  Plaintiff's member-owners have used personal funds and obtained loans to make ends meet.

36.

Despite paying approximately $700 per month to Defendant for advertising, Plaintiff has never seen Defendant mention Plaintiff on any social media platform or on its website aside from Plaintiff appearing on the mall map.  Defendant wastes opportunities during holidays to coordinate events – Plaintiff was ready for and participated in the so-called trick-or-treat event but there was no planning or coordination by Defendant to make the event a cohesive, fun event for shoppers and trick-or-treaters.  Since Defendant disallows any sort of signage or marketing

by tenants outside of the retail spaces and directories, Plaintiff is not in a position to go beyond its physical borders to market for the event in the mall.

37.

In contrast, Plaintiff's YouTube channel has more followers than Defendant's Instagram profile – Plaintiff actively promotes itself on social media platforms.  It partnered with the Salem-Keizer Volcanos to attract a wider audience.  It creates custom art to display at the store. It gives free samples and creates signage to advertise the samples.  They've gotten an aroma generator.

38.

The problem is the rent determined on the basis of a false representation of the foot traffic and tenant sales data.

39.

Plaintiff sent Defendant two distress letters, one on July 28, 2025 and the other on September 25, 2025 requesting rent relief.  A third was sent on November 21, 2025, with a specific request and offer to negotiate a resolution or that Plaintiff would have to seek the remedy of rescission.  Plaintiff's proposed Memorandum of Understanding proposing a structure for negotiating a resolution to this dispute was expressly refused. This was all prior to the Plaintiff learning that Comparable Tenant B indeed had sales data that could have been reported to Plaintiff as it investigated the viability of renting the Premises, sales data that was intentionally concealed by Defendant and its agents when reporting on the requested cross-section of tenant sales data in September of 2023.

//

//

AMENDED COMPLAINT                    9

40.

On December 11, 2025, through counsel, Plaintiff offered to discuss a voluntary close and vacate.  No response to this offer was ever received.

41.

Plaintiff has acted promptly in its prayer for rescission, having only gained the actionable knowledge of Defendant's material misrepresentations and concealments in the last quarter of 2025.

42.

Meanwhile, Plaintiff is aware of at least eleven stores closing since Plaintiff opened in February of 2024.

**CLAIM FOR RELIEF**

(Rescission – Fraud in the Inducement)

43.

Defendant, in order to capture the interest of viable commercial tenants, elected to make representations that (1) it received 4 to 5 million visitors annually; and (2) that the sales data of Similar Tenant B was unavailable because (3) Similar Tenant B was a new tenant.

44.

Defendant's representation to Plaintiff that the mall received 4 to 5 million visitors annually was aimed at leading Plaintiff to believe that because the mall received that kind of foot traffic, and, independently of and coupled with the average tenant sales data provided and the selectively provided tenant cross-section of sales data, that the nearly $10,000 a month in rent and associated costs and fees was justified and would be easily covered by anticipated sales.

//

AMENDED COMPLAINT                    10

45.

Simon, if its representations to its shareholders and the public via its website are true with respect to its leadership/vanguard role in retail intelligence and retail technology, imbued its assets and agents, like Defendant and Marc Wolfer, with the intelligence and technology it touts to possess.

46.

Defendant, based on belief, knew that the mall did not attract and receive 4 to 5 million visitors annually, and further knew and concealed that the space Plaintiff sought to lease saw only a tiny fraction of the already highly inflated representation of pedestrian traffic within its immediate vicinity.

47.

In order for Simon to be able to tell its potential and actual shareholders that it signed a certain number of leases in 2023, Defendant intended for Plaintiff and its Franchisor to rely on its representations and concealments.

48.

The Franchisor would never have recommended that Plaintiff enter into the Lease had it known the mall received only 3.2 million visitors with the back of the mall receiving less than 10% of that number, and Plaintiff would never have entered into the Lease without its Franchisor's approval.  Neither Franchisor nor Plaintiff were in a position to know or measure foot traffic over time during the due diligence period.

49.

Had Franchisor known that Similar Tenant B's rolling total sales were 64% less than the tenant sales average, it would never have recommended that Plaintiff enter into the Lease, and

AMENDED COMPLAINT                          11

Plaintiff would never have entered into the Lease without its Franchisor's approval.  Defendant, based on belief, knew this and intentionally concealed the data it possessed.  Given the general confidentiality of sales data, Franchisor and Plaintiff were ignorant of the sales data and of Similar Tenant B's status as a new or non-new tenant.

50.

Defendant initially advised of two available retail spaces, one of which was purportedly no longer available as of the second week of Plaintiff's show of interest, spurring a sense of urgency. Defendant is an internationally pre-eminent owner of malls and outlets around the world.  Defendant's leasing agents deal with the some of the largest and most sophisticated retailers in the world. Plaintiff had retained professional assistance from a commercial real estate broker, an attorney, and was at all material times consulting its Franchisor about what it learned from Defendant's leasing representative, none of whom saw fit to call into question the trustworthiness of Defendant's representations or omissions. As a result, Plaintiff reasonably relied on the truth of Defendant's representations and selective omissions, and Plaintiff entered into the Lease to its detriment as described in paragraphs 51-54.

**DAMAGES**

51.

As a direct result of Plaintiff having been fraudulently induced into entering into the Lease, Plaintiff spent and is entitled to restitution and reasonable expenditures in reliance on the contract inclusive of the following:

(1) Rent paid to Defendant in the amount of $179,309.59;

(2) The uncompensated labor and time of Plaintiff's two member-owners in the amount of $300,000.00;

AMENDED COMPLAINT                    12

(3) Stock inventory costs in the amount of $264,935.02;

(3) Payroll to non member-owner workers in the amount of $200,000;

(4) Development Council (VDI) loan principal and interest paid in the amount of $10,382.73;

(5) Development Council (VDI) loan principal and interest still owed in the amount of $69,896.67;

(6) Embold line of credit principal and interest paid in the amount of $8,873.00;

(7) Embold line of credit still owed in the amount of $12,365.96;

(8) Insurance premiums of $32,902.80;

(9) Utilities of $12,640.86;

(10) Advertising expenses of $10,689.13;

(11) Operating expenses in the amount of $86,019.41

(12) Buildout costs of $27,000;

(13) Signage costs of $13,000;

(14) Estimated tear out, haul, and labor costs of $25,000;

(15) Estimated refrigerated semi-truck rental costs of $3,500;

(16) Estimated refrigerated storage unit costs of $6,000;

(17) For a total amount of $1,262,515.17.

52.

Plaintiff offers to pay, out of the sum described in paragraph 51(17), as the value of the benefit conferred by Defendant on Plaintiff had Defendant in good faith and without material misrepresentations and concealments leased the same space to it or another tenant, an amount 64% less than the combination of the Minimum Annual Rent and Operating Cost Charges for

AMENDED COMPLAINT                    13

each month of Plaintiff's occupancy, representative of the actual sales data of Similar Tenant B being 64% less than the tenant sales average represented to Plaintiff before it agreed to enter the Lease.

53.

Plaintiff is entitled to punitive damages on the basis that Defendant, as an agent of Simon, and at Simon's direction, and by Simon's design, as a matter of course and as part of a pattern and policy whether written or unwritten, with malice or as a wrongful act done intentionally without just cause or excuse, makes material misrepresentations about the robustness of the mall's pedestrian flow and its tenants' sales in order to induce prospective tenants to enter into Leases, without care to whether the small business tenants actually succeed or stay. Plaintiff was directly injured by the malicious acts of fraudulent inducement, and believes it is one of many tenants fraudulently induced into commercial leases with Defendant.

**ATTORNEY FEES**

54.

Defendant deemed itself entitled to "reimbursement" of its attorney fees pursuant to the fourth (4th) paragraph of section 18.2 of the Lease.  ORS 20.096(1) and *Bennett v. Baugh*, 329 Ore. 282, 286, 985 P.2d 1282, 1284 (1999) allow reciprocation of that right to Plaintiff. ORS 20.083, which was enacted after *Bennett* further entitles Plaintiff to its reasonable attorney fees for prevailing on a theory that the contract is void and should be rescinded.

**JURY TRIAL**

55.

Plaintiff requests a jury trial.

//

AMENDED COMPLAINT                    14

**WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

1.      Rescission of the Lease and restoration of the Parties as nearly as possible to their positions before execution of the Lease;

2.      Restitution and reasonable expenditures in reliance on the contract in the amount of $1,262,515.17, minus the value of the benefit Defendant conferred on Plaintiff as described in paragraph 51;

3.      For reasonable attorney fees pursuant to the authority described in paragraph 54 ;

4.      For Plaintiff's costs and disbursements incurred herein, and for any other relief the Court deems fair and equitable.


DATED: February 11, 2026


<u>**s/ Hilary A. Boyd**</u>
Hilary A. Boyd, OSB No. 152095

AMENDED COMPLAINT                15

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing AMENDED

COMPLAINT on the date indicated below by:

☐      mail with postage prepaid, deposited in the US mail at Portland, Oregon,

☐      hand delivery,

☐      facsimile transmission,

☐      overnight delivery,

☒      electronic filing notification.

I further certify that the copy was delivered as indicated above and addressed to the

following attorneys listed below:

Shane P. Swilley
Cosgrave Vergeer Kester LLP
900 SW Fifth Avenue, 24th Floor
Portland, OR 97204
Email: swilley@cosgrovelaw.com
Attorney for Defendant

     Dated: February 11, 2026


                           **s/ Hilary A. Boyd**
                           Hilary A. Boyd, OSB No. 152095